

EOD

08/27/2010

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DRINKS UNIQUE, INC. and | § | CASE NO.  10-40196-BTR |
| TRU-PAK, INC., | § | (Jointly Administered) |
| | § | (Chapter 11) |
| _____Debtors._____ | § | |
| | § | |
| WORLD WIDE POLYMERS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 10-4034 |
| | § | |
| PLASTIC SOLUTIONS MOLDING, INC., | § | |
| DRINKS UNIQUE, INC., TRU PAK, INC. | § | |
| PLASTIC SOLUTIONS OF TEXAS, INC. | § | |
| SHELF-LIFE MANAGEMENT, INC. | § | |
| KURT H. RUPPMAN, SR., JUDY STOUT | § | |
| RUPPMAN, SHELLI RUPPMAN KRANZ, | § | |
| SHANNON RUPPMAN BECK, KURT | § | |
| HOWARD RUPPMAN, JR. AND | § | |
| KRAIG A. RUPPMAN, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

The plaintiff alleges claims against individual and corporate defendants for violations of

the Texas Uniform Fraudulent Transfer Act ("TUFTA"), breach of fiduciary duty against the

directors officers of Plastic Solutions Molding, Inc. ("PSM"), and tortuous interference with

contract.  The plaintiff also seeks to pierce PSM's corporate veil and hold the defendants jointly

and severally liable for civil conspiracy.  PSM and Shelf-Life Management, Inc. a/k/a Shelf-Life

Solutions, Inc. ("Shelf-Life") are defunct and have not appeared in this action.  Shannon

Ruppman Beck and Kraig A. Ruppman have received bankruptcy discharges.  The remaining

defendants, Drinks Unique, Inc. ("<u>Drinks</u>"), Tru-Pak, Inc. ("<u>Tru-Pak</u>"), Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz and Kurt H. Ruppman, Jr., deny the plaintiff's claims.   At the conclusion of trial on August 10, 2010, the Court took the matter under advisement in order to prepare detailed findings of fact and conclusions of law.   *See* FED. R. BANKR. P. 7052.

## I.    *FINDINGS OF FACT*

1.     Drinks and Tru-Pak filed separate petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq*., on January 21, 2010.   The Court has jointly administered their cases.   Drinks' and Tru-Pak's cases were precipitated by a dispute between Drinks and a secured lender over the refinancing of a loan.

2.     While Drinks and the lender were attempting to work out their issues, the plaintiff filed the present action in the District Court for the 199th Judicial District of Collin County, Texas.   Drinks removed the plaintiff's action to this Court pursuant to 28 U.S.C. § 1452(a).

3.     In its complaint, as amended, the plaintiff asserts that the defendants fraudulently transferred PSM's property to Tru-Pak.   The plaintiff asserts that the defendants conspired to tortiously interfere with PSM's contract to pay the plaintiff for resin.   The plaintiff also asserts that the directors and officers of PSM conspired to breach their fiduciary duties to the plaintiff and PSM.

4.     In the bankruptcy cases, the plaintiff asserts an unsecured claim against Drinks and Tru-Pak in the amount of $1,053,324.36 as of the date of bankruptcy.   Drinks filed a motion seeking to estimate the plaintiff's claim for all purposes pursuant to § 502(c) of the Code.   The

Court scheduled Drinks' motion for hearing at the same time as the plaintiff's adversary complaint.

5.     In this adversary proceeding, the parties submitted a Joint Proposed Pre-Trial Order (the "Pre-Trial Order").  The Court entered the Pre-Trial Order on August 9, 2010.[1]  The Pre-Trial Order contains a blizzard of small details.  However, the core dispute in this case is whether the plaintiff, who is creditor of the now-defunct PSM, can force Drinks and Tru-Pak to pay its unsecured claim.  The ability of Drinks and Tru-Pak to reorganize hangs in the balance.

## A.     THE FORMATION OF THE PST COMPANIES

6.     Karl Ruppman, Sr. founded Plastic Solutions of Texas, Inc. ("PST") on February 3, 1995.   PSM and Shelf-Life were wholly owned subsidiaries of PST.   (The Court may collectively refer to PST, PSM and Shelf-Life as the "PST Companies".)  PSM was in the business of providing bottles to dairy customers while Shelf-Life focused on developing technologies for extending the shelf life of bottled dairy products.

7.     Mr. Ruppman was the president and chief executive officer of PSM at all relevant times.   Several family members also held positions with PSM or owned shares of PSM.   For example, Shelli Ruppman Kranz served as the secretary for PSM.

8.     John Albers began financially assisting PSM in 1998.   On July 1, 1999, Mr. Albers and Mr. Ruppman entered into a Purchase Agreement whereby Mr. Albers acquired a 67% interest in PSM for $2,160,000.  In the Purchase Agreement, Mr. Albers agreed that he or one of his affiliated entities would provide PSM with a line of credit up to a maximum of

---

[1] The plaintiff does not assert claims for damages against PSM, Shelf-Life, Shannon Beck Ruppman or Kraig A. Ruppman in the Joint Pre-Trial Order.  Once entered, a pretrial order governs the trial.  *See* FED. R. CIV. P. 16(d); *Morris v. Homco Int'l, Inc.,* 853 F.2d 337, 342 (5th Cir. 1988).

$7,000,000.  As of July 1, 1999, financing equal to $4,138,963 had been made by Fairfield Enterprises, Inc. pursuant to this commitment.

9.      On June 29, 2005, Judy Stout Ruppman loaned $175,000 to PST and PSM in order to keep the PST Companies afloat while Shelf-Life's technology gained momentum.  She received, in exchange, a lien on certain patent applications by PST and PSM.  On July 27, 2005, she filed a UCC-1 financing statement with the Texas Secretary of State.

10.      In November 2005, Shelf-Life entered into several commercial leases of its technology with Milk Products, L.P. d/b/a Borden Dairy ("Borden Dairy").  These leases produced a significant stream of monthly income for Shelf-Life.

11.      On December 31, 2005, Mr. Albers, PST and PSM entered into Promissory Note A in the principle amount of $24,151,628.39 (hereinafter "Albers Note A") and Promissory Note B in the principle amount of $1,113,329.91 (hereinafter "Albers Note B").  These Promissory Notes amended and superseded the prior line of credit provided by Fairfield Enterprises, Inc.  To secure its obligations under Albers Notes A and B, PSM entered into an Amended and Restated Security Agreements granting Mr. Albers a lien on all of PSM's assets, including equipment, machinery, contract rights, and accounts receivable.

12.      Mr. Ruppman testified that PSM's profits declined as providing bottles to dairy customers became more and more of a commodity business.  Because of PSM's declining profitability, PSM could only obtain financing from banks if Mr. Ruppman personally guaranteed repayment and Mr. Albers agreed to subordinate his liens on PSM's assets.

13.      Mr. Ruppman, as president and chief executive officer for PSM, entered into two loan agreements with Hibernia National Bank in early 2006.  In particular, on April 14, 2006,

PSM entered into a Promissory Note in the principle amount of $8,800,000 (hereinafter the "Term Note") and a Promissory Note in the principle amount of $1,000,000 (hereinafter the "Revolving Line of Credit Note").  PSM's payment obligations were secured by a lien on all of its tangible and intangible assets.  Contemporaneously with the execution of the Term Notes and the Revolving Line of Credit Note, Mr. Albers entered into a Subordination Agreement dated April 14, 2006.  In addition, Mr. Ruppman personally guaranteed repayment of PSM's indebtedness to Hibernia National Bank under the Notes.

14.     On November 30, 2007, ARKO Financial Group, LLC ("ARKO") acquired by assignment the Term Note and Revolving Line of Credit Note and payable to Capital One, N.A. f/k/a Hibernia National Bank.   Mr. Albers was the sole member and manager of ARKO.  PSM was indebted to ARKO in at least the amount of $8.5 million as of December 31, 2007.

15.     Mr. Albers and/or his affiliates maintained valid, properly perfected liens in the amount of approximately $35 million against the PST Companies.  The liens held by Mr. Albers and/or his affiliates were secured by the assets of the PST Companies, including all of PSM's equipment.

### B.  PSM FAILS TO PAY THE PLAINTIFF FOR RESIN

16.     The plaintiff, World Wide Polymers, Inc. ("WWP"), sold resin to PSM.  The resin was essential to PSM's operations.  PSM, however, ceased making payments on invoices due to the plaintiff on or about November 19, 2007.

17.     The plaintiff understood that it was an unsecured creditor.  The valid liens held by Mr. Albers and his affiliated entities, among others, were a matter of public record.  As a result, the plaintiff was on notice of these liens at the time it extended credit to PSM to purchase resin.

18.     Beginning in late November 2008, the plaintiff pressed Mr. Ruppman to pay its outstanding invoices.  The plaintiff did not extend any credit to PSM to purchase resin after December 21, 2008.

19.     The plaintiff continued to demand payment of its outstanding invoices, which totaled $657,893.  On January 17, 2008, Mr. Ruppman responded that he was meeting with Mr. Albers' financial advisor, Mr. William Rhame.  On January 22, 2008, Mr. Ruppman informed the plaintiff that he was still negotiating with Mr. Albers.  On February 1, 2008, Mr. Ruppman sent the plaintiff an e-mail stating that he was still waiting on Mr. Albers and that he would be in touch "when I know for sure what is going to happen with the company."

20.     The negotiations between Mr. Albers and Mr. Ruppman had become contentious.  Mr. Albers' health was failing, and he was seeking to negotiate the termination of his entire business relationship with Mr. Ruppman.  PSM's financial problems were merely one of the issues on the table.

21.     In early 2008, Mr. Albers made it clear to Mr. Ruppman that he would not assist PSM in obtaining additional funds to meet its operating needs.  Mr. Albers informed Mr. Ruppman that he would not sign any guaranties of PSM's debts or subordinate his liens in favor of any future lender.  This decision meant that PSM had no means to obtain the funds necessary to pay its creditors or continue operations.

22.     The plaintiff ultimately initiated a collection action against PSM.  On April 22, 2008, the plaintiff served PSM with notice of its suit on a sworn account.  On October 13, 2008, the plaintiff obtained a default judgment against PSM in the amount of $657,893, plus attorney's

fees, costs, pre- and post-judgment interest.  On July 13, 2009, the plaintiff filed its Abstract of Judgment with the Collin County District Clerk's office.

23.     The parties agree that PSM was insolvent by February 2008.  In addition to PSM's obligation to the plaintiff, PSM owed $358,000 to the Internal Revenue Service, $221,000 to its landlord for unpaid rent, $125,000 for past due utilities, and more than $300,000 to another unsecured creditor holding a judgment against it, among other debts.

24.     PSM faced the possibility that its landlord might lock it out of its manufacturing facility due to PSM's defaults under its lease.  PSM could not easily remove its equipment, which was large and heavy, from the leased premises.

### C.     MR. ALBERS AND MR. RUPPMAN (TRY TO) PART WAYS

25.     Mr. Ruppman testified that he and Mr. Albers first considered closing PSM in late 2006.  Mr. Ruppman testified that Mr. Albers' health had been failing for some time.  According to Mr. Ruppman, they negotiated how they would extricate themselves from their business relationship throughout 2007.

26.     Early in the negotiations, they believed that Shelf-Life was very valuable.  Borden Dairy was making monthly payments of approximately $75,000 to Shelf-Life under the technology leases.  Mr. Albers and Mr. Ruppman expected demand for Shelf-Life's technology to continue producing a substantial income stream with the possibility of more technology leases in the future.

27.     In or around 2007, Mr. Ruppman began developing a new technique for brewing organic tea as well as a filling process to extend the shelf life of the product.  In early 2007, Mr. Ruppman formed Drinks for the purpose of brewing and selling tea under the name "True Brew"

as well as brewing and packaging tea for other private labels.  Mr. Ruppman has been partially responsible for Drinks' daily operations since its formation.  Judy Stout Ruppman serves as Drinks' director and is its sole shareholder.  Shelli Ruppman Kranz serves as Drinks' secretary and treasurer.

28.     Mr. Ruppman formed Tru-Pak on January 22, 2008.  Mr. Ruppman serves as Tru-Pak's chief executive officer and has been responsible for its daily operations.  Although Judy Ruppman holds the title of president and is Tru-Pak's sole director, her testimony revealed that she has little knowledge of its operations and business dealings.  Shelly Ruppman Kranze serves as Tru-Pak's secretary and treasurer.

29.     Mr. Ruppman formed Tru-Pak to manufacture bottles for Drinks as well as customers in the dairy industry.  Drinks is the sole shareholder of Tru-Pak.

30.     On February 6, 2008, Mr. Albers sent Mr. Ruppman a memorandum setting forth a global settlement proposal.  Mr. Albers proposed that he would obtain 100% ownership of Shelf-Life and its technology and receive a cash payment of $1 million.  In exchange, Mr. Albers proposed to release his liens on PSM's equipment and pay a monthly royalty based on the gallons of product produced using Shelf-Life's system.

31.     On February 8, 2008, Drinks applied for a $1 million purchase money line of credit from Opportunity Bank, N.A. ("Opportunity Bank).  Drinks engaged Ash Hutchison, a certified public accountant, to assist in its application to Opportunity Bank.  Mr. Hutchinson had been assisting PSM with its end-of-month bookkeeping for some time.

32.     Mr. Ruppman hoped that Mr. Albers would invest in Drinks.  However, at some point in early 2008, Mr. Albers declined the investment opportunity.

33.     By the end of February 2008, Mr. Albers and Mr. Ruppman had engaged attorneys to assist in documenting their initial settlement.  Fred Kolodey represented Mr. Ruppman in the negotiations.

34.     On or about February 28, 2008, a representative of Opportunity Bank met with Mr. Ruppman at Drinks' facility.  Opportunity Bank anticipated that it would approve Drinks' loan application after the site visit.

35.     However, on February 28, 2008, Borden Dairy notified Shelf-Life that it had elected to terminate the leases of Shelf-Life's technology effective May 31, 2008.  This development – which was wholly unexpected – destroyed the tentative settlement between Mr. Ruppman and Mr. Albers.

36.     On the same day, February 28, 2008, Mr. Kolodey's wife suffered a stroke.  Mr. Kolodey was unable to devote his full attention to his representation of Mr. Ruppman for the next several months.  Mark Castillo of the Curtis Law Firm, P.C., thereafter represented Mr. Ruppman or his entities in connection with the global settlement with Mr. Albers.  Mr. Kolodey continued to review and comment on the settlement documents exchanged by the parties when he was able.

37.     Mr. Ruppman met with Mr. Rhame, the financial advisor for Mr. Albers, on March 3, 2008.  Mr. Rhame informed Mr. Ruppman that ARKO would not release its lien on PSM's equipment and would, instead, begin foreclosure proceedings.

38.     On March 13, 2008, counsel for ARKO sent a letter to PSM notifying PSM that it intended to foreclose on the collateral securing PSM's indebtedness to ARKO.

39.     On March 14, 2008, counsel for ARKO sent PSM notice that its obligations under Term Note and the Revolving Line of Credit were immediately due and payable based on the occurrence of certain events of default.  Counsel for ARKO advised Mr. Ruppman to contact Mr. Rhame for the exact payoff amount.

40.     In addition, on March 14, 2008, counsel for Mr. Albers sent PSM notice that obligations under Albers Notes A and B were immediately due and payable based on the occurrence of certain events of default.  Counsel for Mr. Albers advised Mr. Ruppman to contact Mr. Rhame for the exact payoff amount.

41.     Mr. Albers retained an auctioneer in connection with his foreclosure efforts.  The auctioneer inspected ARKO's collateral on March 20, 2008.

### D.     MR. ALBERS AND MR. RUPPMAN REACH A SECOND AGREEMENT

42.     On or about April 4, 2008, Mr. Albers and Mr. Ruppman reached a different settlement agreement.  Mr. Albers now wanted $2 million in cash plus royalties on Shelf-Life's future income (if any) from its technology.   However, as discussed below, the settlement documents are ambiguous about what Mr. Albers was offering in exchange inasmuch as the documents provide for the assignment of the notes and liens held by Mr. Albers and ARKO and, at the same time, provide that PSM's assets would be transferred free and clear of such liens.

43.     The first settlement fell apart because of Borden Dairy's decision to cancel its technology leases with Shelf-Life.  The defendants did not conspire to frustrate the plaintiff's collection efforts or any other unsecured creditor of PSM by entering into a second settlement.

44.     Drinks and Tru-Pak applied to Opportunity Bank for a $2.4 million loan to fund the proposed settlement with Mr. Albers.  Richard Barresse, the plaintiff's president, testified

that the plaintiff would and could have loaned the funds necessary for PSM to fund its obligations under the settlement agreement.

45.     Mr. Barresee may earnestly believe, today, that the plaintiff would have loaned PSM several million dollars, but his testimony was not credible.  The plaintiff is not in the financing business.  The plaintiff did not offer to provide PSM with a loan in early 2008 -- even though the plaintiff knew PSM was strapped for cash.  The plaintiff, at the time, was pressing Mr. Ruppman for payment on past due invoices.

46.     PSM had previously obtained loans from third party lenders only when Mr. Albers and his affiliated entities agreed to subordinate their liens.  In addition, third party lenders had required Mr. Albers and/or Mr. Ruppman agreed to personally guaranty the debt.

47.     On April 16, 2008, Robert Webb & Associates, Inc. appraised PSM's assets in connection with Drinks' application for a $2.4 million loan from Opportunity Bank.  According to the appraiser, the liquidation value of the assets located at PSM's two bottle-making facilities was approximately $5.8 million.

48.     The defendants do not dispute that the value of PSM's assets was approximately $5.8 million.  The parties also agree that the amount of secured debt owed by PSM to Mr. Albers and ARKO was more than $8.5 million.

49.     On or about April 22, 2008, Mr. Albers and Mr. Ruppman executed a document entitled "Settlement Agreement."[2]  Mr. Castillo represented PST and PSM in the negotiation of the Settlement Agreement.

---

[2] Mr. Ruppman signed the document four times – for himself, as president of PSM, as president of PST, and as president of Shelf-Life.  Mr. Albers signed the document two times – for himself and as ARKO's member.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW – PAGE 11

50.     The Settlement Agreement was a termination of the business relationship between Mr. Albers and Mr. Ruppman.  In addition, from PSM's perspective, the Settlement Agreement was a resolution of the foreclosure action threatened by its secured lenders, Mr. Albers and ARKO.  PSM's assets were fully encumbered by valid liens, and, therefore, unsecured creditors had no stake in those assets.

51.     PSM, Shelf-Life, PST, Mr. Ruppman, Mr. Albers and ARKO were parties to the Settlement Agreement.   The Settlement Agreement contained several components: (1) Mr. Ruppman was to pay a non-refundable forbearance fee of $50,000 to Mr. Albers;[3] (2) Mr. Albers was to assign all of the promissory notes and liens he and ARKO held to Tru-Pak; (3) PSM was to transfer its assets to Tru-Pak; (4) Tru-Pak was to pay $2,000,000 to PSM; (5) PSM was to pay Mr. Albers or his affiliated entities $2 million in cash (less the $50,000 forbearance fee); and (6) Shelf-Life was to agree to pay Mr. Albers a product royalty fee.

52.     The $2 million cash payment is defined as the "Assignment Price" in the Settlement Agreement.  Paragraph 2 of the Settlement Agreement provides in pertinent part:

> To facilitate Secured Parties' respective assignment …, Secured Parties shall promptly prepare and file UCC-3 lien assignments reflecting the assignment of the UCC-1 liens upon and security interests in the Assets, …, and to provide such other documents as may be required for PSMI to convey title to the Assets free and clear of Secured Parties' liens, security interests, and claims ….

53.     On April 23, 2008, Opportunity Bank funded the $50,000 forbearance fee via a wire transfer to ARKO.   Although the appraisal indicated that PSM's assets were worth approximately $5.8 million, Opportunity Bank required a guaranty of repayment from Mr.

---

[3] The Settlement Agreement prohibited Mr. Ruppman from using any funds belonging to PST or PSM to fund the forbearance fee.

Ruppman.   Mr. Ruppman executed a personal guaranty that that Drinks and Tru-Pak would repay Opportunity Bank on April 23, 2008.

### E. THE PARTIES ENTER INTO AN ASSET PURCHASE AGREEMENT

54.     The parties subsequently asked Mr. Kolodey to draft an Asset Purchase Agreement based on the terms of the Settlement Agreement.   The Asset Purchase Agreement was intended to effectuate the Settlement Agreement and was part of the same transaction.

55.     The parties executed the Asset Purchase Agreement on or about May 8, 2008. Page two of the original Asset Purchase Agreement provided for the sale of PSM's assets to Tru-Pak, as follows:

> 2.1     The aggregate Purchase Price for the Assets shall be TWO MILLION AND NO/100 dollars ($2,000,000.00).
> 2.2     The Purchase Price shall be paid by Purchaser to Sellers in cash at closing or at Sellers' request, the Purchase Price shall be paid jointly to Secured Creditors (Arko Financial Group, LLC and John R. Albers).

56.     The defendants did not intend to hinder, delay or defraud PSM's creditors through the Asset Purchase Agreement.   Rather, the parties intended to effectuate the settlement with PSM's secured creditor given the secured creditor's stated intent to foreclose.   The parties also intended to minimize the potential tax consequences to PSM, including any income for forgiveness of debt.

57.     Drinks and Tru-Pak signed a promissory note dated as of May 6, 2008 made payable to Opportunity Bank in the original stated principal amount of $2.4 million.   In addition, Kurt H. Ruppman, Sr. and Judy Stout Ruppman executed a Guaranty Agreement with Opportunity Bank dated as of May 6, 2008.

58.     On or about May 6, 2008, Mr. Ruppman, as president of PSM, executed a document entitled "Bill of Sale" whereby PSM transferred its assets to Tru-Pak for the stated sum of $10.00.  According to Mr. Kolodey, when Tru-Pak became the owner of PSM's assets, and the holder of the notes secured by PSM's assets, PSM's obligations under the notes would be effectively cancelled by operation of the doctrine of merger.

59.     On or about May 8, 2008, Mr. Rhame executed allonges for all of the notes held by Mr. Albers and ARKO.[4]  The allonges assigned the notes to Tru-Pak.

60.     On or about May 8, 2008, Kurt H. Ruppman, Sr., Kraig Ruppman, Kurt H. Ruppman, Jr., and Shelli Ruppman Kranze executed the minutes of a special meeting of PSM's board of directors and shareholders.  They resolved, among other things, to complete the winding up and dissolution of PSM.

61.     Opportunity Bank funded the remainder of the $2.4 million loan to Drinks on May 8, 2008.  Opportunity Bank wired $1,950,000 million to ARKO pursuant to the Settlement Agreement.

62.     Shortly after purchasing PSM's assets, Tru-Pak sold some of those assets to a third party.  Drinks and Tru-Pak used the proceeds to fund their business operations.

63.     Mr. Albers passed away approximately six months after the parties effectuated the Settlement Agreement.

64.     In August 2008, Mr. Hutchison worked with Tru-Pak's bookkeeper, Shelli Ruppman Kranz, to account for the settlement transaction.  They booked the transaction as if

---

[4] Mr. Rhame executed allonges for the promissory notes payable to Mr. Albers pursuant to a power of attorney from Mr. Albers.  Mr. Rhame executed allonges for the two notes payable to ARKO as vice president of ARKO.

Tru-Pak had paid $2 million to PSM for its assets.  They did not account for the transfer of the notes held by Mr. Albers and ARKO to Tru-Pak.

65.     In September or October 2008, Drinks applied for a loan with the Small Business Administration.  Drinks was attempting to refinance its loan with Opportunity Bank.  However, a loan officer at the Small Business Administration notified Mr. Hutchison that he believed the settlement transaction had been improperly booked.

66.     Mr. Hutchison investigated the issue raised by the loan officer at the Small Business Association.  Mr. Hutchison examined, for the first time, the Bill of Sale and Asset Purchase Agreement drafted by Mr. Kolodey.  On January 30, 2009, Mr. Hutchison asked Mr. Kolodey to explain his understanding of the legal aspects of the Settlement Agreement and Asset Purchase Agreement.

67.     In responding to Mr. Huchison, Mr. Kolodey learned that PSM's assets had been appraised for approximately $5.8 million.  Mr. Kolodey had previously understood that PSM's assets had been appraised for $2 million and had drafted the Asset Purchase Agreement based on this misunderstanding.

68.     To correct his mistake, and to make the Asset Purchase Agreement consistent with the parties' intent and understanding, Mr. Kolodey altered the Purchase Price on the second page of the Asset Purchase Agreement.  The amended version of the Asset Purchase Agreement deleted paragraph 2.2 and replaced paragraph 2.1 with the following language:

> 2.1 The aggregate Purchase Price for the Assets shall be $2,000,000.00 cash plus $3,776,447.00 credit against the April 14, 2000 Note originally payable to Hibernia National Bank in the amount of $8,800,000.00.  The cash portion of the Purchase Price shall be paid to Sellers at closing, or at Sellers' request, such cash shall be paid jointly to secured creditors (Arko Financial Group, LLC and John R. Albers). $26,500.00 shall be allocated to the PST Assets and the balance to PSMI.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW – PAGE 15

69.     Mr. Kolodey also drafted a new Bill of Sale.  The new Bill of Sale dated May 8, 2008, states that PST and PSM were selling their assets to Tru-Pak for $2,000,000.[5]

70.     Given that Mr. Albers effectively released PSM from its obligations under the promissory notes that he and ARKO held, the revisions to paragraph 2.1 of the Asset Purchase Agreement and the Bill of Sale appear to change only the potential tax consequences of the transaction for PSM.  The changes to the Asset Purchase Agreement and Bill of Sale did not have any adverse consequences for PSM's unsecured creditors.

71.     Mr. Kolodey testified, credibly, that he intended to reconcile the Asset Purchase Agreement with the Settlement Agreement through his changes to the Asset Purchase Agreement and the Bill of Sale.

72.     Mr. Hutchison re-booked the settlement transaction based on Mr. Kolodey's amendment of the Asset Purchase Agreement and Bill of Sale.

73.     In their consolidated tax return for 2008, Drinks and Tru-Pak reported the $3,776,447 credit against the April 14, 2000 Note originally payable to Hibernia National Bank as income (*i.e.*, a gain on a note receivable).  However, the realization of such income for tax purposes does not necessarily mean that PSM did not receive at least $5.8 million in value as a result of the Settlement Agreement.

74.     PSM received far more than $2 million in cash for the sale of its assets.  In addition to $2 million in cash, which PSM used to pay down its secured debt, PSM obtained the effective release of all of the notes held by Mr. Albers and ARKO.

---

[5] The Bill of Sale dated May 8, 2008, was executed by Mr. Ruppman as president of PST and PSM and by Judy Ruppman as president of Tru Pak.

75.    The transfer of PSM's assets to Tru-Pak was not an attempt to defraud the plaintiff.  The defendants did not attempt to conceal the transfer from PSM, and they did not remove or abscond with PSM's assets.  Moreover, Drinks, Tru-Pak, and the other defendants did not intend to hinder, delay or defraud PSM's creditors through the transfer of PSM's assets.

76.    The defendants did not usurp or misappropriate a corporate opportunity of PSM.

77.    PSM did not have the financial resources to take advantage of any business opportunity to extinguish its secured debts.  PSM did not have the ability to sell assets free of the liens held by Mr. Albers and ARKO without their consent.  PSM did not have the ability to raise $2 million in cash prior to the threatened foreclosure by Mr. Albers and ARKO.

78.    Moreover, PSM could not have entered into the Settlement Agreement with Mr. Albers on its own.  PSM did not have the ability to transfer ownership of Shelf-Life to Mr. Albers, nor did PSM have the ability to transfer a royalty interest in Shelf-Life's technology to Mr. Albers.

79.    PSM's secured debt far exceeded the value of its assets.  At the time of the challenged transfer, the plaintiff, as an unsecured creditor of PSM, could not have reached PSM's assets to satisfy its claim.

80.    The value of the consideration received by PSM was reasonably equivalent to the value of the assets transferred to Tru-Pak.

81.    The testimony of the plaintiff's expert, Steve Thomas, was based on incorrect assumptions of fact.  The Court, therefore, did not find his testimony persuasive.

82.    The defendants did not tortiously interfere with the plaintiff's contract with PSM. The parties entered into the Settlement Agreement long after PSM had defaulted on its payment

obligations to the plaintiff.  The defendants did not induce PSM to breach its contract with the plaintiff.  Rather, as detailed in the Court's findings, PSM lacked the income to pay its unsecured creditors – including the plaintiff.

83.    Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz and/or Kurt H. Ruppman, Jr. did not cause any person or entity to be used for the purpose of perpetrating an actual fraud, or individually perpetrate an actual fraud, on the plaintiff.

84.    Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz and Kurt H. Ruppman, Jr. did not receive a direct personal benefit or make a personal profit from the transfer of PSM's assets.

85.    The property of PSM, on the one hand, and the property of Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz and Kurt H. Ruppman, Jr., on the other hand, has been kept separate.  Likewise, PSM, Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz and Kurt H. Ruppman, Jr. have kept separate books and records.

86.    Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz and Kurt H. Ruppman, Jr. have not comingled individual funds with the funds of PSM, diverted PSM's profits to their personal use, or used PSM to evade any obligations to creditors.

## II.    CONCLUSIONS OF LAW

### A.    PLAINTIFF'S TUFTA CLAIMS

1.    Texas adopted TUFTA in 1987.  *See* TEX. BUS. & COM. CODE §24.001, *et seq*. Under § 24.005(a)(1) of TUFTA, an actual fraudulent transfer occurs in relation to a particular creditor when: (1) the creditor's claim arose before or within a reasonable time after the transfer

was made; and (2) the debtor acted with "actual intent to hinder, delay, or defraud any creditor of the debtor." *See id.* § 24.005(a)(1).

2. Under § 24.005(a)(2), a constructively fraudulent transfer occurs when: (1) the creditor's claim arose before or within a reasonable time after the transfer was made; (2) the debtor did not receive reasonably equivalent value in exchange for the transfer; and (3) the debtor was engaged in a business or transaction for which its remaining assets were unreasonably small or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur debts beyond its ability to pay as they became due. *See id.* § 24.005(a)(2). TUFTA also contains a second provision regarding constructive fraud, § 24.006(b), under which a constructive fraud occurs when: (1) the creditor's claim arose before the transfer; (2) the debtor made the transfer without receiving reasonably equivalent value in exchange; and (3) the debtor was insolvent at that time or became insolvent as a result of the transfer. *See id.* § 24.006(b).

3. Under TUFTA, a "transfer" means disposing of or parting with an "asset." TEX. BUS. & COM. CODE § 24.002(12). The statute defines an "asset" as "property of a debtor," but expressly excludes "property to the extent it is encumbered by a valid lien." *Id.* § 24.002(2)(A).

4. TUFTA § 24.002(2)(A) is modeled after § 1 of the Uniform Fraudulent Transfer Act. The accompanying commentary explains the exclusion of encumbered property from the operation of the Act as follows:

> This Act, like its predecessor and the Statute of 13 Elizabeth, declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims. The laws protecting valid liens against impairment by levying creditors, exemption statutes, and the rules restricting levyability of interest in entireties property are limitations on the rights and remedies of unsecured creditors, and it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of "asset" for the purposes of this Act.

5.      Here, the asset transfer challenged by the plaintiff is not subject to TUFTA §§ 24.005(a)(1) or 24.006(b).  The property alleged to have been fraudulently transferred was encumbered by a valid lien, and, therefore, is not an asset that may be fraudulently transferred.

6.      The plaintiff attempts to avoid this difficulty by arguing that, since PSM transferred its assets to Tru-Pak free and clear of all liens, its assets were not encumbered by a lien at the time of the transfer.  Thus, according to the plaintiff, the transfer is subject to TUFTA. However, the Settlement Agreement and the Asset Purchase Agreement do not provide for a release of the liens held by Mr. Albers and ARKO on PSM's assets.  Their liens were effectively released by operation of law as a result of the transfer of both the promissory notes and the property securing those notes to Tru-Pak.  The plaintiff cannot accept the validity of this transfer, and the consequent release of liens, and then use TUFTA to attack the transfer.

7.      The asset transfer challenged by the plaintiff is not actually fraudulent within the meaning of TUFTA § 24.005(a)(1) because the asset transfer was not made with actual intent to hinder, delay or defraud the plaintiff.

8.      The asset transfer challenged by the plaintiff is not constructively fraudulent under TUFTA § 24.005(a)(2) ir § 24.006(a) because PSM received reasonably equivalent value at the time of the transfer.   In particular, PSM received $2 million in cash as well as the assignment (and effective release) of the remainder of the secured debt held by Mr. Albers and ARKO.  *See* TEX. BUS. COM. CODE § 24.004(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied….").

9.      The asset transfer challenged by the plaintiff is not constructively fraudulent under TUFTA § 24.006(a) because the property alleged to have been fraudulently transferred was encumbered by a valid lien, and, therefore, is not an asset that may be fraudulently transferred.

10.     Liability for any alleged violation of TUFTA may not be imposed against Drinks, Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz or Kurt H. Ruppman, Jr. as none of the foregoing Defendants are "transferees" under TUFTA.   TEX. BUS. & COM. CODE § 24.009.

11.     The existence of intercompany transfers between Drinks and Tru-Pak do not, standing alone, make Drinks a transferee of the assets alleged to have been fraudulently transferred.  *See* TEX. BUS. & COM CODE § 24.009.

### B.      THE SETTLEMENT DOCUMENTS ARE AMBIGUOUS

12.     The Asset Purchase Agreement attempted to effectuate the Settlement Agreement by using the $2 million to purchase PSM's assets free and clear of liens while, at the same time assigning those liens to Tru-Pak.  The Settlement Agreement and the Asset Purchase Agreement are unclear regarding what PSM and Tru-Pak received.

13.     The plaintiff asserts that all PSM received was $2 million for the transfer of assets worth approximately $5.7 million to Tru-Pak.  The defendants argue that PSM also received a release of approximately $35 in secured debt held by Mr. Albers and ARKO.

14.     If the wording of a contract is clear, but the meaning is reasonably susceptible to more than one interpretation, the language in question is rendered legally ambiguous and

extrinsic evidence may be considered.  *See Heritage Res., Inc. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996).

15.    When interpreting an ambiguous contract, the Court's primary concern is to give effect to the parties' intent.  *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 428 (5th Cir. 2003).  In doing so, the Court is required to read all parts of the contract together to ascertain the agreement of the parties, while ensuring that each provision of the contract is given effect and none are rendered meaningless.  *Id*.

16.    Here, as previously discussed, Mr. Ruppman and Mr. Albers intended to terminate their business relationship.  They intended that Mr. Albers would receive $2 million and an assignment of royalties from Shelf-Life.  The parties intended that Mr. Albers and ARKO would no longer have the ability to foreclose on or otherwise enforce their liens against PSM's assets.  The Settlement Agreement reflects this intent.

17.    From PSM's perspective, it received $2 million for the sale of its assets to Tru-Pak as well as a release of the liens Mr. Albers and ARKO held on all of PSM's.

18.    Mr. Kolodey's amendment of the Asset Purchase Agreement, his amendment of the Bill of Sale, and the re-booking of the transaction, are consistent with the parties' intent.

## C.    PLAINTIFF'S FIDUCIARY DUTY AND PIERCING CLAIMS

19.    In general, Texas law does not recognize a cause of action brought by a creditor against the officers or directors of a debtor company.  "[A] party who has contracted with a financially weak corporation and is disappointed in obtaining satisfaction of his claim cannot look to the dominant stockholder or parent corporation in the absence of additional compelling

facts." *Tigrett v. Pointer,* 580 S.W.2d 375, 382 (Tex. Civ. App. – Dallas 1978, writ ref'd n.r.e.) (citing *Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336, 340 (Tex. 1968)).

20.     A shareholder or affiliate may be held liable for the contractual obligations of a corporation if a creditor establishes that the shareholder is or was the alter ego of the corporation, actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory.  *See* TEX. BUS. ORG. CODE § 21.223(a).  In addition, a shareholder or affiliate may be held liable if the creditor demonstrates that the shareholder or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the creditor primarily for the direct personal benefit of the shareholder.  *See* TEX. BUS. ORG. CODE § 21.223(b).

21.     In this case, neither Mr. Ruppman nor any of the other defendants were PSM's alter ego.  The defendants did not use PSM to perpetrate a fraud on the plaintiff.

22.     The primary case cited by the plaintiff in its trial brief holds that officers and directors of an insolvent corporation owe a fiduciary duty to creditors to assure that creditors get their fair share of the corporation's assets.  *Fagan v. La Gloria Oil and Gas Co.*, 494 S.W.2d 624, 628 (Tex. App. – Houston [14th Dist.] 1973, no writ).  The plaintiff also cites a Fifth Circuit case discussing the potential liability of officers and directors of a corporation to creditors when the corporation enters the "zone of insolvency." *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 533-34 (5th Cir. 2004).

23.     To the extent the officers and directors of PSM had any fiduciary duty to PSM's unsecured creditors in this case, that duty included preserving the value of the corporate assets to pay corporate debts without preferring one creditor over another or preferring themselves to the injury of other creditors.  *See Tigrett,* 580 S.W.2d at 383-85.  However, a creditor may pursue

corporate assets and hold officers and directors liable only for "that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors." *Id.* at 384.

24.     Here, PSM owed debts far in excess of its assets.  Those debts were secured by valid liens.  Regardless of how PSM structured its settlement with Mr. Albers, no portion of PSM's assets would have been distributed to the plaintiff.  The plaintiff, therefore, cannot establish that the defendants violated any duty to them based on the transfer of PSM's assets to Tru-Pak.  This transfer did not render PSM insolvent – PSM was hopelessly insolvent before the challenged transaction.

25.     PSM's officers and directors had no obligation to continue to operate an insolvent company or take out additional loans in a futile effort to ensure that all creditors were paid.  The continued operation of PSM, and the deepening of its insolvency, could have exposed PSM's officers and directors to claims for damages.  *See In re VarTec Telecom, Inc.*, 335 B.R. 631, 645-46 (Bankr. N.D. Tex. 2005).

### D.    PLAINTIFF'S OTHER CLAIMS

26.     In its complaint, as amended, the plaintiff asserts that it had a contract with PSM for the payment of goods.  The plaintiff further asserts that the defendants interfered with its contract by hindering PSM's performance.

27.     Under the facts of this case, the Court concludes that the defendants did not induce PSM to breach a contract with the plaintiff.  *John Paul Mitchell Systems v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 730-31 (Tex. App. – Austin 2000, pet. denied).

28.      The defendants did not commit any independent tortious act justifying intentional interference with a contract between PSM and the plaintiff.  *Southwestern Bell Telephone Company v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex. 1992).

29.      No defendant committed or agreed to commit in concert with any tortuous or unlawful act in furtherance of a conspiracy.  *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983).

30.      For all of the foregoing reasons, the plaintiff does not have an allowed unsecured claim against the bankruptcy estates of Drinks and Tru-Pak.

31.      To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  Likewise, any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

**III.      *Conclusion***

For the foregoing reasons, the Court finds and concludes that the defendants have not fraudulently transferred the assets of PSM, nor are Defendants Drinks, Kurt H. Ruppman, Sr., Judy Stout Ruppman, Shelli Ruppman Kranz or Kurt H. Ruppman, Jr. liable to the plaintiff transferees under TUFTA.  The Court further finds and concludes that dthe efendants did not breach fiduciary duties owed to either PSM or the plaintiff.  Finally, the Court concludes that the defendants did not intentionally or willfully interfere with the plaintiff's contract with PSM, that the defendants had an absolute legal right to take all challenged actions as recognized by both TUFTA and the UCC, and that there was no fraudulent or otherwise illegal activity supporting the plaintiff's claims to pierce the corporate veil or for civil conspiracy.

Signed on 08/27/2010

*Brenda T. Rhoades*                    SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE